# UNITED STATES COURT OF APPEALS

# FOR THE FIRST CIRCUIT

_____

### NO. 15-1170

### IN RE: DZHOKHAR TSARNAEV,

### Defendant/Petitioner

_____

REDACTED FOR PUBLIC DOCKET

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO STAY JURY SELECTION AND PETITION FOR A WRIT OF MANDAMUS

Tsarnaev does not claim – and cannot show – that the ▮ prospective jurors the district court has so far found fair and impartial and otherwise qualified to sit on the jury in this case are in fact unfair and biased; instead, relying on broad (and, in the government's view, inaccurate) generalizations, he claims that this Court must presume the district court has qualified (and will seat) unfair and biased jurors despite conducting a rigorous and searching voir dire, and that the presumption of bias is so clear and so compelling that he is entitled to the extraordinary remedy of mandamus relief. He is wrong.

Voir dire "has long been recognized as an effective method of rooting out . . . bias, especially when conducted in a careful and thoroughgoing manner."

Patton v. Yount, 467 U.S. 1025, 1038 n.13 (1984) (internal quotation marks and citation omitted).  Accord Correia v. Fitzgerald, 354 F.3d 47, 52 (1st Cir. 2003) ("The best way to ensure that jurors do not harbor biases for or against the parties is for the trial court to conduct a thorough voir dire examination.  Assuming that venirepersons pass through this screen, the trial court thereafter may operate on the presumption that the chosen jurors will obey the judge's instructions to put extraneous matters aside and decide each case on its merits.") (citations omitted). The courts have consistently held that voir dire is an effective method of identifying unbiased jurors even in high-profile cases involving crimes with a major impact on the local community.  See, e.g., United States v. Skilling, 561 U.S. 358, 378 (2010) (affirming decision to try former Enron CEO in Houston); United States v. Salameh, 1993 WL 364486, *1 (S.D.N.Y. Sep. 15, 1993) (finding that impartial jurors could be found to try first World Trade Center bombers in lower Manhattan); People v. Charles Manson, 132 Cal. Rptr. 265, 309-10 (App. Dep't Super. Ct. 1976) (finding that fair jury could be found for Charles Manson trial in Los Angeles) (collecting cases); New York v. David Berkowitz, 93 Misc.2d 873, 879 (1978) (finding that impartial jurors could be found to try "Son of Sam" murder trial in Brooklyn).

Only once has the Supreme Court found that pretrial publicity alone had so poisoned an entire jury pool that voir dire could not be relied upon to root out juror

bias, and the facts of that case are far different from those here.  In Irvin v. Dowd, 366 U.S. 717 (1961), decided over 50 years ago, the defendant, Irvin, was convicted of committing one of a string of six murders and sentenced to death.  Id. at 719.  The trial took place in Gibson, Indiana, "a rural county of approximately 30,000 inhabitants."  Id.  Four of the murders occurred in March 1955, and the defendant was arrested on April 8, 1955.  Id.  Shortly after his arrest, the prosecution and police "issued press releases, which were intensively publicized, stating that the petitioner had confessed to the six murders."  Id. at 719-20.  In addition,

> a barrage of newspaper headlines, articles, cartoons and pictures was unleashed against him during the six or seven months preceding his trial. . . .   [T]he newspapers in which the stories appeared were delivered regularly to approximately 95% of the dwellings in Gibson County. . . . [In] addition, the Evansville radio and TV stations, which likewise blanketed that county, also carried extensive newscasts covering the same incidents.  These stories revealed the details of his background, including a reference to crimes committed when a juvenile, his convictions for arson almost 20 years previously, for burglary and by a court-martial on AWOL charges during the war.  He was accused of being a parole violator.  The headlines announced his police line-up identification, that he faced a lie detector test, had been placed at the scene of the crime and that the six murders were solved but petitioner refused to confess.  Finally, they announced his confession to the six murders and the fact of his indictment for four of them in Indiana.  They reported petitioner's offer to plead guilty if promised a 99-year sentence . . . and that petitioner had confessed to 24 burglaries (the modus operandi of these robberies was compared to that of the murders and the similarity noted). . . .   [One story] characterized petitioner as remorseless and without conscience. . . .  In many of the stories petitioner was described as the 'confessed slayer of six,' a parole violator and fraudulent-check artist. . . .  On the day

3

> before the trial the newspapers carried the story that Irvin had orally admitted the murder of Kerr (the victim in this case) as well as 'the robbery-murder of Mrs. Mary Holland; the murder of Mrs. Wilhemina Sailer in Posey County, and the slaughter of three members of the Duncan family in Henderson County, Ky.'

Id. at 725-26.

In contrast, local pretrial publicity concerning Tsarnaev has not been nearly so adverse. The Eastern Division of this district contains approximately 5,000,000 people rather than 30,000, and the trial will take place nearly two years after Tsarnaev's arrest rather than just seven months later. The Supreme Court has repeatedly relied on those types of differences in distinguishing other cases involving claims of presumed prejudice from Irvin. See, e.g., Skilling, 561 U.S. at 382-83; Mu'Min v. Virginia, 500 U.S. 415, 429 (1991); Patton, 467 U.S. at 1032-34. The Boston Globe and Boston Herald, which by Tsarnaev's reckoning have contained most of the local publicity about this case, are delivered regularly to less than 7% of the district's population rather than 95%. [Docket entry ("D.") 461-1, at 9 n.16]. The articles in those papers have not been unduly inflammatory or prejudicial, as the district court has twice found. United States v. Tsarnaev, 2014 WL 4823882, *2 (D. Mass. Sept. 24, 2014); United States v. Tsarnaev, 2015 WL 45879, *4 (D. Mass. Jan. 2, 2015). There have been no reports of a criminal history, of an offer to plead guilty, of a confession to other crimes, or of damaging last-minute admissions. On the contrary, to the extent reporters have wondered in

print about why Tsarnaev might have committed the bombings, they have mostly repeated the very same theory that Tsarnaev's attorneys have advanced in pleadings and in open court – that his brother made him do it.  In short, here – as in all of the Supreme Court's post-<u>Irvin</u> presumed-prejudice cases – the record does not reveal a "barrage of inflammatory publicity immediately prior to trial amounting to a huge . . . wave of public passion that the Court found in <u>Irvin</u>." <u>Patton</u>, 467 U.S. at 1033.[1]8 F. Supp. 1467 (W.D. Okla. 1996), but that case is even less on point.  The parties in McVeigh *agreed* that the case could not be tried in the district where the bombing occurred (the main courthouse had been severely damaged and the only alternative was unsuitable).  <u>Id.</u> at 1470.  The only question before the court was where to move the trial.  <u>Id.</u>  The presiding judge, who normally sat in Denver but had been specially designated to try the <u>McVeigh</u> case, decided to transfer it to his own courtroom in Denver.  He took pains to note that because "special precautions and logistical arrangements" needed to be made in advance at whatever courthouse was ultimately chosen, he considered it "impracticable and inimical to the public interest in [a speedy trial]" to follow the

---

[1] The only other cases in which the Court has presumed prejudice -- <u>Rideau v. Louisiana</u>, 373 U.S. 723 (1963), <u>Estes v. Texas</u>, 381 U.S. 532 (1965), and <u>Sheppard v. Maxwell</u>, 384 U.S. 333 (1966), "were entirely lacking in the solemnity and sobriety to which a defendant is entitled . . . . and therefore cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process."  <u>Murphy v. Florida</u>, 421 U.S. 794, 799 (1975).

ordinary and "preferred practice" of gauging "the effects of pretrial publicity . . . by a careful and searching voir dire examination." Id.

Although the district judge in McVeigh did cite as one basis for his decision the large number of people in the district who were personally affected by the crime, the Supreme Court in Skilling discounted the significance of diffuse community impact:  it rejected the argument that "Enron's sheer number of victims trigger[ed] a presumption of prejudice," 561 U.S. at 384, holding instead that "the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron" and that "the extensive screening questionnaire and follow-up voir dire were well suited to that task." Id.  The same is true here, as we now show.

**1.**
**The procedures employed in this case**
**for ensuring a fair and impartial jury**

The district court's procedures for selecting a fair and impartial jury in this case have been thorough, rigorous, and fair.  The district court began by summoning approximately 1,340 potential jurors to the courthouse on three successive days (January 5, 2015 through January 7, 2015) to fill out a 27-page questionnaire prepared mainly by the parties (with some editing by the court). The jurors were divided into six panels, labelled Panel A through Panel F, each consisting of approximately 225 jurors.  Before filling out the questionnaires, the

jurors were sworn to tell the truth.  After filling them out, they were required to sign an oath under the pains and penalties of perjury attesting that their answers were true and complete.

The members of the panel were also ordered by the court not to discuss the case with anyone or to read, listen to, watch, or research anything about it, and they were warned that a violation of that order could be punished as a contempt of court.  The questionnaires themselves also contained the following reminder:

> Do not discuss anything about this case with anyone and do not read, listen to, or watch anything relating to this case until you have been excused as a potential juror, or if you are selected as a juror, until the trial is over.  You may not discuss this case or allow yourself to be exposed to any discussions of this case in any manner.

[G.S.App.3].

Based solely on a review of the completed questionnaires, the parties jointly proposed to strike ▮ potential jurors from Panel A and ▮ from Panel B, mainly on grounds of hardship, and the district court agreed to strike all of them.    On January 15, 2015, the court began individual voir dire of the remaining jurors in Panels A and B.  So far, the court has questioned 137 jurors over eleven days and has qualified ▮ to sit on the jury.  (Additional agreed-upon strikes based mainly on previously-overlooked hardship grounds disclosed in the questionnaires have significantly reduced the number of jurors who need to be interviewed in person.) At this rate the court will likely qualify a full complement of 70 potential jurors by

███████████████████████████████████████████████

██████████████ (To seat 12 jurors and six alternates, allowing for 23 peremptory strikes by each party, the court needs to qualify only 64 potential jurors, but the court has informed the parties that it intends to qualify 70 to be safe.)

The district court has structured voir dire in a manner designed to put the jurors at ease and maximize their willingness to be candid and forthcoming. The judge, court reporter, and the parties sit together around a large table in the well of the courtroom. Jurors are invited into the courtroom one by one and take a seat at the table. The proceedings are public -- two members of the press and up to ten members of the public are invited into the courtroom, and the proceedings are transmitted live via closed-circuit television to overflow courtrooms – but the arrangement adopted by the district court is conducive to full and truthful responses by the jurors.

The court questions each juror based mainly on his or her answers to the questionnaire and then permits the parties to ask their own questions. Both parties have taken full advantage of this opportunity. The court has focused its questioning of each juror on four areas, even in cases where a particular juror's questionnaire did not necessarily indicate a need for follow-up questioning in that area: potential hardship, preconceptions regarding guilt or punishment (if any),

personal connection to the events underlying the indictment (if any), and ability to participate fairly in a capital sentencing proceeding (if needed).

### 2.
### The defendant's claims are bootless.

The district court undertook a "detailed review of juror questionnaires in preparation for voir dire" and found that they "confirmed, rather than undermined, [his] judgment that a fair and impartial jury can and will be chosen to determine the issues in this case." [D. 954]. Contrary to the claims Tsarnaev makes in his petition, a fair-minded review of the questionnaires, as well as of the voir dire itself, confirm the accuracy of the district court's finding.

Tsarnaev alleges that of the 1,373 jurors filling out questionnaires, all but four said they had been exposed to publicity about the case; but the same would undoubtedly be true of jurors in other federal districts as well. Tsarnaev's own telephone survey, commissioned in May 2014, revealed that nearly 100% of respondents in Springfield, New York City, and Washington, D.C. said they had been exposed to publicity about this case. [D. 461-23, at 4]. That is hardly surprising. The Marathon bombings were the largest mass-casualty terrorist attack on American soil since September 11, 2001. The attacks killed three, injured hundreds more, and interrupted an internationally famous sporting event. The bombings and their bloody aftermath were televised live and then rebroadcast innumerable times to the Nation and the world. They were also captured in videos

and photographs that have been posted on the internet and collectively viewed millions of times by a worldwide audience.

Although Boston media outlets – notably the Boston Globe and Herald – have undoubtedly published more articles about the attacks than other papers, the Globe's entire circulation of approximately 225,000 amounts to less than 5% of the Eastern District's population of five million, and the Herald's amounts to only 2%, making it likely that only a small fraction of the local population has been exposed to those articles.  Given the nationwide interest in the bombings, a particular juror's news-consumption habits are likely to have a far greater impact on his or her exposure to pretrial publicity than the district in which he or she lives.  In short, the nationwide notoriety of this case substantially diminishes the importance of its local notoriety as a factor in the venue calculus.

The same is true of potential jurors' opinions about Tsarnaev's guilt.  According to Tsarnaev's petition, the completed jury questionnaires show that 68% of prospective jurors already believe that he is guilty.  [Pet. at 9-10].  But according to Tsarnaev's own May 2014 telephone survey of potential jurors in the Boston, Springfield, New York City, and Washington, D.C., areas, the percentages in those districts who believe Tsarnaev is "definitely" or "probably" guilty are even greater:  84% in Springfield, 92% in New York City, and 86% in Washington, D.C.  [D. 461-23, at 5].  Once again, the widespread belief in

Tsarnaev's guilt is hardly surprising.  As the Supreme Court first observed in 1878 and has repeated many times since, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits."  Reynolds v. United States, 98 U.S. 145, 155–156 (1878).  Accord Irvin, 366 U.S. at 722-23; Skilling, 561 U.S. at 381.  It is safe to assume that almost everyone in the country has heard something about this case, and that potential jurors in other districts, no less than those who live here, have "some impression or some opinion in respect to its merits."  Reynolds, 98 U.S. at 156.

But that doesn't mean jurors cannot set aside their beliefs and apply the presumption of innocence.  On the contrary, "it is a premise of [our] system that jurors will set aside their preconceptions when they enter the courtroom and decide cases based on the evidence presented."  Skilling, 561 U.S. at 398 n.34.  Accord Irvin, 366 U.S. at 723 ("To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."); Wells v. Murray, 831 F.2d 468, 472 (4th Cir. 1987) ("[Jurors] are presumed to be

impartial . . . [and the] existence of a juror's preconceived notion as to the guilt of the accused will not by itself destroy the presumption of impartiality.").   It is certainly possible that some prospective jurors in this case are already so convinced of Tsarnaev's guilt that they cannot be impartial; but according to Tsarnaev's own analysis, of the 68% of potential jurors in this case who have formed an opinion that Tsarnaev is guilty, fully 60% said they could set aside that opinion and decide the case solely on the evidence, meaning that three-quarters of the approximately 1,373 jurors who completed questionnaires have an open mind about the case.

The question on the jury questionnaire regarding preconceptions about Tsarnaev's guilt is worded so broadly that it gives no reason to doubt jurors' assurances that they could decide the case on the evidence despite having a preconceived opinion.   The question states in pertinent part:

77.  As a result of what you have seen or read in the news media, or what you have learned or already know about the case from any source, have you formed an opinion:

(a) that Dzhokhar Tsarnaev is guilty?     Yes     No     Unsure

(G.S.App.20).  A person knowing nothing about this case except that Tsarnaev was arrested and charged with the Marathon bombings might well form an opinion, based on those facts alone, that he is guilty; but the same is true of every juror in every case, regardless of the level of pretrial publicity.  Those types of opinions are

easily set aside once a juror is instructed that neither an arrest nor an indictment is evidence of guilt, that defendants are presumed innocent, and that the presumption remains with them unless and until the government proves each and every element of a charged crime beyond a reasonable doubt.   Lay jurors also may interpret the word "guilty" in a non-legal, commonsense fashion, to mean something more akin to "present" at the events, or "involved" in them.

An examination of the actual voir dire of jurors in this case paints a reassuring picture of their ability to be fair and impartial despite exposure to some pretrial publicity, repaying the Supreme Court's confidence that "jurors will set aside their preconceptions when they enter the courtroom and decide cases based on the evidence presented."  Skilling, 561 U.S. at 398 n.34.  It also shows that the few jurors who felt they could not set aside a preconceived opinion did not hesitate to say so and were excused.

These are the responses of the first 20 jurors from Panel A to be questioned about their exposure to pretrial publicity, its effect (if any) on their opinion of Tsarnaev's guilt, and their ability to set aside their opinions (if any) and decide the case solely on the evidence.







In short, of the first 20 jurors to be questioned during voir dire, only five had formed an opinion about Tsarnaev's guilt that could not be set aside, and all five freely admitted it – and were excused for cause – without the need for extended questioning.  That is surely no worse a result than one would expect from any highly-publicized case – and the result would likely be the same in Springfield, New York City, Washington, D.C., or any other district where people read the newspaper, watch television, or surf the Internet.

Tsarnaev also contends that in answering Questions 81, 82 and 83 on the questionnaire, 69 percent of prospective jurors identified a "personal connection to the people and events at issue[] in the case" [Pet. 2, 10], but that characterization is misleading. Question 81, for example, asks if a "family member or close friend" was personally affected by the events underlying the indictment (G.S.App.21-22), regardless of whether the juror considers that to be a "personal connection" of his own.

Similarly, Question 82 asks if "anyone in your family or household has personally (1) taken part in any of the activities, events, or fundraisers that have been held in support of the victims of the Boston Marathon bombings; (2) contributed to the One Fund; or (3) bought or worn any merchandise, clothing, or accessories that have logos such as 'Boston Strong.'" Id.  Tsarnaev characterizes any juror who answers "yes" to that question as having a self-identified "personal connection" to the Marathon, even if the "yes" answer results solely from a juror or household member's having owned a single item – perhaps a t-shirt or keychain -- labeled "Boston Strong," having contributed a token amount to the One Fund, or having gone to a concert designed to raise money for victims because someone else provided tickets.

Tsarnaev reproduces quotes from approximately three dozen questionnaires completed by jurors who were personally affected by the Marathon bombings, but

he does not claim, and could not truthfully claim, that those questionnaires were selected at random or are statistically representative of the entire jury pool's responses.  An examination of the first 30 jurors to be questioned during voir dire paints a much more accurate and representative picture of prospective jurors' personal connection to the bombings.   The chart below reproduces their answers to Questions 81, 82, and 83, along with any follow-up questioning requested by the parties or conducted sua sponte by the court.

| Juror # | Answer to Q 81, 82, 83 | Voir dire |
|---------|------------------------|-----------|
|         |                        |           |



These responses are self-evidently the work of conscientious jurors plumbing their memories for any information responsive to Questions 81-83, no matter how trivial it might seem to them or anyone else. Yet these very responses, and others like them, are the basis for Tsarnaev's breathless and insupportable claims that "an extraordinary" 69 percent of jurors "have a self-identified connection or expressed allegiance to the people, places, and/or events at issue in the case" (Pet. at 2); that jurors have "bias — explicit and implicit, conscious and unconscious — flowing from [their] powerful emotional connections to the people, places, and events of the Boston Marathon bombing;" id.; that "[t]he conduct of jury selection to date has damaged both the appearance of impartiality and public confidence in the fairness of the proceedings beyond repair" id.; and that "[a] stronger basis for presumed prejudice is difficult to conceive," id. at 11.

Tsarnaev cites three instances in which, he claims, he "fortuitously discovered the real impact on and resulting bias of some potential information learned outside the voir dire process."  (Pet. 23).  But at least two of his three examples show no such thing.  He notes that ███████ disclosed in both his questionnaire and during voir dire that a friend of his, ██████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████ but fails to explain how that "fortuitous[] discovery" revealed previously-undisclosed bias on the part of the juror.  (Although the juror did not disclose the friend's name during voir dire, no one asked him for the name.)  Tsarnaev also notes that after the voir dire of ██████ ██████ he checked Facebook and saw ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████ Tsarnaev then jumps to the remarkable conclusion that the juror's husband's actions not only necessarily "reflect a strong (and understandable) identification with the victims in this case," but also "demonstrate an alliance that cannot help but color his wife's view of this case."

[Pet. 26-27].  Evidently, it is self-evident to Tsarnaev that Juror ▆▆▆ is incapable of holding opinions independent of her husband's.

In any event, this Court has recognized that voir dire, while not a perfect method of uncovering juror bias, remains "a singularly important means of safeguarding the right to an impartial jury."  Sampson v. United States, 724 F.3d 150, 163 (1st Cir. 2013); see also id. at 163-164 ("A probing voir dire examination is '[t]he best way to ensure that jurors do not harbor biases for or against the parties.'") (quoting Correia, 354 F.3d at 52).  ▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

**3.**
**Mandamus is not warranted**.

As we noted in response to Tsarnaev's first petition for a writ of mandamus, this Court has never decided whether a district court's discretionary decision not to order a change of venue is ever an appropriate subject for a mandamus petition.  In re Kouri-Perez, 134 F.3d 361 (1st Cir. 1998) (unpublished).  Even assuming for the sake of argument that it is, Tsarnaev still must meet the demanding requirements

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

for mandamus relief, and he cannot do so.  As this Court pointed out in <u>In re</u> <u>Bulger</u>, 710 F.3d 42, 45-46 (1st Cir. 2013), application of mandamus principles to a district court's discretionary decision requires "a doubly deferential review":  relief is available only if the defendant can show that it is clear and indisputable that the district court abused its discretion and that the defendant will suffer irreparable harm as a result.  <u>See also</u> <u>Bulger</u>, 710 F.3d at 45 (mandamus places an "exacting burden on those who request it"; defendant must establish that his right to relief is clear and indisputable and that he will otherwise suffer irreparable harm).

Tsarnaev cannot show that he willl suffer irreparable harm by this Court's refusal to consider his mandamus petition because any claim that the jury was biased may be vindicated after trial.  Nor does this case raise the concern expressed in <u>Bulger</u> that failure to act on Bulger's claim that the trial judge, a former Assistant U.S. Attorney who held supervisory positions in the United States Attorney's Office during time periods relevant to Bulger's case, should have recused himself and that "untoward Government action in the past may affect the fairness of the judicial branch in the present."  710 F.3d at 57.  In this case, the district court's discretionary decision not to order a change of venue did not call upon him to reflect upon his own behavior or partiality, but rather to make the kind of assessment that judges make every day in courtrooms around the country.  Absent some truly extraordinary misstep by a trial judge, decisions about whether a

change in venue is needed and the effectiveness of a painstaking and searching voir dire should not become the basis for halting a criminal prosecution pending the resolution of an interlocutory proceeding.

Nor has Tsaranev established a clear entitlement to relief. While another judge might have elected to transfer this case to another district, the district court's discretionary decision to conduct a thorough and searching voir dire in an effort to seat an impartial jury locally was not palpably erroneous. United States v. Horn, 29 F.3d 754, 769 (1st Cir.1994) (mandamus will not issue unless the order is palpably erroneous). Tsarnaev argues that newspaper opinion pieces expressing views on the venue issue demonstrate the error in the district court's decision. But opinion pieces are not themselves evidence of what is actually taking place in the courtroom; nor do news columnists decide the law. Courts do, however, and Skilling compels denial of the defendant's petition.

## Conclusion

For these reasons, the government respectfully requests that the Court deny the defendant's motion to stay the trial and petition for a writ of mandamus.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By: */s/ William D. Weinreb*
WILLIAM D. WEINREB
ALOKE S. CHAKRAVARTY
NADINE PELLEGRINI
Assistant U.S. Attorneys

## Certificate of Service

I, William Weinreb, Assistant U.S. Attorney, hereby certify that on February 6, 2015, I electronically served a copy of the foregoing document on the following registered participants of the CM/ECF system:

Judith H. Mizner, Esq.
William W. Fick, Esq.
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
Boston, MA 02210

I also certify that on February 5, 2015, I electronically served a copy of this document on following counsel of record who is not registered participants of the CM/ECF system:

David I. Bruck, Esq.
Washington and Lee University
2200 Sydney Lewis Hall
Lexington, VA 24450

Judy Clarke, Esq.
Clarke & Rice, APC
Suite 1800
1010 Second Ave
San Diego, CA 92101

In addition, I certify that on February 6, 2015, I served a copy of this document on the district court by email on January 1, 2015.

*/s/ William D. Weinreb*
WILLIAM D. WEINREB
Assistant U.S. Attorney