# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

_____

**Appeal No. 15-1170**


**IN RE: DZHOKHAR TSARNAEV,**
**Defendant/Petitioner**

_____

## GOVERNMENT'S FURTHER OPPOSITION TO DZHOKHAR TSARNAEV'S MOTION TO STAY JURY SELECTION AND SECOND PETITION FOR A WRIT OF MANDAMUS

Pursuant to the Court's February 12, 2015 order, the government submits, in opposition to Tsarnaev's second petition for a writ of mandamus, the following arguments in addition to those set out in the government's January 1, 2015 opposition to Tsarnaev's first petition for a writ of mandamus (filed in Appeal No. 14-2362) and in its February 6, 2015 opposition to Tsarnaev's second petition for a writ of mandamus (filed in Appeal No. 15-1170).

As set forth below, a district court's decision about the appropriate venue for trial is highly discretionary, involving an assessment of factual material and a balancing of potentially conflicting interests that the district court is uniquely qualified to undertake. That makes it nearly impossible for a litigant to show a clear and indisputable right to a particular outcome as required for mandamus review. It is also nearly impossible for a litigant to demonstrate that an adverse

outcome will cause him irreparable harm, because claims of both presumed and actual prejudice are routinely addressed on direct review. Although mandamus is generally available to correct a district court that has exceeded the limits of its judicial powers or made a palpably erroneous decision, the district court's three opinions spelling out the reasons for its venue decision demonstrate that it has considered all of the evidence, knows the law, and has made a reasoned decision. The possibility that another judge might have made a different decision does not warrant the extraordinary and disruptive remedy of mandamus.

## I.
## Mandamus is Inappropriate Here

The government's oppositions to Tsarnaev's first and second petitions for a writ of mandamus noted that this Court has never decided whether mandamus review is available for an order denying a motion for a change of venue. Given the additional time and pages authorized by this Court's February 12, 2015 order, we think it prudent now to more fully explore the limits of mandamus power.

Although federal appellate courts have the power to issue writs of mandamus under the All Writs Act, 28 U.S.C. §1651(a), such writs are drastic and are to be used sparingly and only in extraordinary situations. *In re Cargill, Inc*., 66 F.3d 1256, 1259 (1st Cir 1995). *See also Allied Chem. Corp. v. Daiflon, Inc*., 449 U.S. 33, 34 (1980) (*per curiam*) ("It is not disputed that the remedy of mandamus is a drastic one, to be invoked only in extraordinary situations."). As evidenced by

what is taking place in this very case, "such writs disrupt the mechanics of the judicial system" – by "accelerating appellate intervention" and "disturb[ing] the historic relationship between trial and appellate courts." *In re Cargill, Inc.*, 66 F.3d at 1259. They have the potential "to spawn piecemeal litigation," *In re Recticel Foam Corp.,* 859 F.2d 1000, 1005 (1st Cir. 1988), and, at times, mischief. And their use has "the unfortunate consequence of making a district court judge a litigant." *Allied Chem. Corp.*, 449 U.S. at 35.

To limit the use of mandamus, courts have developed prophylactic principles for its issuance, discussed in brief in the government's prior oppositions to Tsarnaev's petitions for a writ of mandamus:  "A petitioner seeking mandamus must show both that there is a clear entitlement to the relief requested, and that irreparable harm will likely occur if the writ is withheld*." In re Cargill, Inc.*, 66 F.3d at 1260. The requirement of showing "clear entitlement to relief" has been variously described as requiring "a question anent the limits of judicial power" and involving a ruling that is "palpably erroneous," *United States v. Horn*, 29 F.3d 754, 769 (1st Cir. 1994); a violation of an "indisputable right," *In re Pearson,* 990 F.2d 653, 656 (1st Cir. 1993); or a jurisdictional error, *In re Justices of Supreme Court of Puerto Rico,* 695 F.2d 17, 21 (1st Cir. 1982).

This limitation on mandamus means that "[a]s a general matter, mandamus will not issue to control exercises of discretion."  *In re Recticel Foam Corp.*, 859

F.2d at 1006. "Where an action is committed to judicial discretion, it cannot often be said that a party's claim of entitlement to a particular result meets this benchmark…. Interlocutory procedural orders, particularly case management orders…, rarely will satisfy this precondition for mandamus relief." *Id.* (*internal citations omitted*). Rather, trial management issues are generally left to the district courts, which are "in a unique position to gauge and balance the potentially conflicting interests at stake" and accordingly "enjoy a broad measure of discretion in managing pretrial affairs." *Id. See also Allied Chem. Corp*, 449 U.S. at 36 ("Where a matter is committed to discretion, it cannot be said that a litigant's right to a particular result is 'clear and indisputable.'").[1]

The second prophylactic rule is the requirement that there be some special showing that irreparable harm is likely to occur. "[This] Court has written that a party seeking mandamus must have no other adequate means to attain the relief he desires . . . . Because interlocutory orders are reviewable on appeal from final judgment, a mandamus petitioner who attacks such an order must ordinarily demonstrate that something about the order, or its circumstances, would make an end-of-case appeal ineffectual or leave legitimate interests unduly at risk." *In re Recticel Foam Corp*., 859 F.2d at 1005 (*internal citations and quotation marks*

---

[1]For this reason, at least one circuit court of appeals has held that mandamus cannot be used to control a district court's ruling on a motion for a change of venue. *Ratke v. Picard*, 283 F.2d 945, 945 (6th Cir. 1960); *Hoffa v. Gray*, 323 F.2d 178, 179 (6th Cir. 1963).

*omitted*).  Notably, "the expense of litigation ordinarily does not constitute irreparable injury, and this [C]ourt has specifically rejected the general burdensomeness of litigation as a basis for assuming mandamus jurisdiction."  *In re Justices of Supreme Court of Puerto Rico,* 695 F.2d at 20; *see also In re Bushkin Assocs., Inc.*, 864 F.2d 241, 244 (1st Cir. 1989) (delay and expense do not establish irreparable injury).  Nor does speculation that a district court's error may result in reversal constitute "irreparable harm":  "although there is always some harm in litigating for naught, that harm repeatedly has been held insufficient, in itself, to justify mandamus relief."  *In re Cargill, Inc*., 66 F.3d at 1263, n.6 (*citation omitted*).  *See also In re Union Leader Corp.,* 292 F.2d 381, 384 (1st Cir. 1961) ("We cannot accept the argument that, absent mandamus, a lengthy trial may ensue for naught.  This argument would apply to every interlocutory ruling which might affect the outcome of a case.  It has been repeatedly rejected.").  As this Court has noted, since most interlocutory orders are fully reviewable on direct appeal after final judgment, "absent exceptional circumstances…resort to the writ will rarely, if ever be justified."  *In re Bushkin Assoc., Inc*., 864 F.2d at 243 (internal quotation marks omitted).

We have already explained why Tsarnaev has failed to show clear entitlement to relief.  On the merits (as to whether there is any error at all), as empanelment proceeds, it becomes ever clearer that Tsarnaev's claims that a fair

and impartial jury cannot be empanelled are unsupportable. As of Friday afternoon on February 13, the district court has selected 54 fair and impartial jurors. The correctness of the district court's ruling is further addressed in section II, below.

Importantly, however, mandamus is not intended to review the merits of arguments that may be reviewed later during an end-of-case appeal. Bypassing this important restriction on mandamus relief involves this Court in pre-trial litigation that, in addition to diverting resources away from the trial of the case, short circuits the district court's management of the trial and its employment of procedural safeguards that ensure a fair and impartial jury. That this is so is evidenced by some of the factors considered by the *Skilling* Court in rejecting Skilling's presumption-of-prejudice claim: the district court's use of an extensive screening questionnaire and follow-up *voir dire* in identifying prospective jurors' connections to Enron, the court's continuance of the trial for two weeks after a coconspirator's guilty plea to reduce the risk of unfair prejudice, and its inquiries of the jurors regarding publicity. *Skilling v. United States*, 561 U.S. 358, 384-385 (2010). Thus, in seeking mandamus, Tsarnaev also effectively seeks review of the district court's employment of measures that would undercut a prejudice argument on direct appeal. *Cf. In re Martinez-Catala,* 129 F.3d 213, 217 (1st Cir. 1997) ("Interlocutory review, after all, interferes with the ordinary processes of trial and appeal; and absent interlocutory review, many issues wash out along the way.").

Indeed, the district court may, and likely will, take additional measures, especially if a particular need for them arises.  In *Skilling*, for example, the Supreme Court noted:

> In addition to focusing on the adequacy of *voir dire*, our decisions have also "take[n] into account ... other measures [that] were used to mitigate the adverse effects of publicity."  *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 565, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976).  We have noted, for example, the prophylactic effect of "emphatic and clear instructions on the sworn duty of each juror to decide the issues only on evidence presented in open court."  *Id.,* at 564, 96 S.Ct. 2791. Here, the District Court's instructions were unequivocal; the jurors, the court emphasized, were duty bound "to reach a fair and impartial verdict in this case based solely on the evidence [they] hear[d] and read in th[e] courtroom." App. 1026a.  Peremptory challenges, too, "provid[e] protection against [prejudice],"  *United States ex rel. Darcy v. Handy,* 351 U.S. 454, 462, 76 S.Ct. 965, 100 L.Ed. 1331 (1956); the District Court, as earlier noted, exercised its discretion to grant the defendants two extra peremptories, App. 1020a; see supra, at 2910.

*Skilling*, 561 U.S. at 388, n. 21.

Moreover, the Court's analysis in *Skilling* suggests that a full and fair appraisal of Tsarnaev's prejudice claim should await the end of trial. In affirming the lower court's venue decision, the *Skilling* Court considered it "[o]f prime significance . . . [that] Skilling's jury acquitted him of nine insider-trading counts." 561 U.S. at 383.  The Court reasoned:  "It would be odd for an appellate court to presume prejudice in a case in which jurors' actions run counter to that

presumption." Developments in this case may likewise run counter to the presumption of prejudice that Tsarnaev urges this Court to find.

Tsarnaev's attempt to engage this Court's supervisory power on a routine trial management issue also means that, in his view, mandamus would be foreseeably available for other routine decisions. If this Court holds that mandamus is an appropriate way to obtain interlocutory review of routine trial management decisions like choice of venue, it is foreseeable that he or other litigants will seek it for other routine decisions as well, such as rulings on in *limine* motions and jury instructions. These too could implicate purportedly important constitutional issues. But mandamus is not intended to invite or authorize this sort of premature and piecemeal litigation of routine questions.

Rather, as the government noted in its initial response to Tsarnaev's second petition for mandamus, mandamus review requires that Tsarnaev not only show that the district court has abused its discretion in denying the change of venue (that is the standard applicable on direct appeal from any conviction), but that it has so clearly done so that its actions lie outside the scope of its authority or constitute a judicial usurpation of power. *Allied Chem. Corp.*, 449 U.S. at 35 ("Although a simple showing of error may suffice to obtain a reversal on direct appeal, to issue a writ of mandamus under such circumstances would undermine the settled limitations upon the power of an appellate court to review interlocutory orders.")

(*internal citation and quotation marks omitted*); *id.* ("Only exceptional circumstances, amounting to a judicial usurpation of power, will justify the invocation of this extraordinary remedy."); *Will v. United States*, 389 U.S. 90, 95 (1967) (declining to reach the merits because "only exceptional circumstances amounting to a judicial 'usurpation of power' will justify the invocation of this extraordinary remedy.").  Nothing in Tsarnaev's multiple pleadings comes close to establishing anything like that.  The district court's three opinions denying Tsarnaev's motions for a change of venue show that it has considered all the evidence, understands the law correctly, and made a reasoned decision that takes into account each of the factors identified as important in *Skilling*.  For mandamus relief to be available, the issue must "not [be] merely close to the line but clearly over it."  *In re Vazquez-Botet*, 464 F.3d 54, 57 (1st Cir. 2006).[2]  That simply is not the case here.

Tsarnaev also cannot demonstrate irreparable harm because the district court's venue decision will be reviewable on direct appeal.  As the *Skilling* case illustrates, claims of both presumptive and actual prejudice are routinely raised and decided on direct appeal.  *See also United States v. Quiles-Olivo*, 684 F.3d 177,

---

[2] *See Application of Cohn*, 332 F.2d 976, 977 (2nd Cir. 1964) (wherein court of appeals denied the defendant's petition for a writ of mandamus, finding that "a high degree of discretion must be vested in the trial judge both as to the place of trial, the selection of the jury and the conduct of the trial itself," and that defendant could not show a clear abuse of that discretion).

182-84 (1st Cir. 2012) (reviewing on appeal whether there was a presumption of prejudice or actual prejudice from pretrial publicity).  In his first petition, Tsarnaev claimed that his impartial jury claim cannot be vindicated on direct appeal because, in his view, if he were to prevail, a second trial in a new venue would follow after months of publicity, rendering it difficult to obtain a fair jury in the new district.  This argument hardly makes sense.  If, as Tsarnaev claimed in his first petition, people in other districts are more likely to be impartial than people in this district, that will certainly remain true years after the bombings, *i.e.*, after the time it takes to try the case in this venue and complete direct appellate review.  Moreover, if this Court orders a change of venue, it is likely that months of publicity will precede trial in the new district anyway.  As the Court of Appeals for the Second Circuit commented in 1964, "[m]odern means of news communication have taken away many of the reasons for the transfer of the *cause celebre* which may have existed fifty years ago."  *Application of Cohn*, 332 F.2d at 977.   In any event, "irreparable harm" generally means a petitioner's inability to vindicate a perceived existing wrong without mandamus, and we are aware of no case law that would support the proposition that it may be based on pure speculation.  *See Cheney v. U.S. Dist. Court for Dist. of Columbia.* 542 U.S. 367 (2004) ("party seeking issuance of writ [must] have no other adequate means to attain the relief he desires….—a condition designed to ensure that the writ will not be used as a substitute for the regular

appeals process") (internal citation and quotation marks deleted); *In re Bushkin Associates, Inc.*, 863 F.3d at 243 ("[i]t is hornbook law that a party who yearns for the nectar of mandamus must be unable otherwise to slake his thirst"); *In re Pearson*, 990 F.2d 653, 661 (1st Cir. 1993) (declining to speculate "about the purely hypothetical consequences that may or may not flow" from perceived error).

Tsarnaev's other claim of irreparable injury, made in both his first and second petitions, is equally unavailing. That argument is based on this Court's decision in *In re Bulger*, 710 F.3d 42 (1st Cir. 2013). When addressing irreparable harm, the Court said, "we can leave aside any question of harm personal to the defendant and concentrate on damage to the judicial system." *Id.* at 49. Tsarnaev argues that failure to transfer his case raises just such an issue about the appearance of justice. As discussed in the government's opposition to his second petition, Tsarnaev is wrong in thinking these cases are analogous. This Court has long recognized that issues of judicial disqualification present an extraordinary situation were public confidence in the courts may require mandamus review. *In re Cargill*, 66 F.3d at 1262 (citing cases). *See also In re Bergeron*, 636 F.3d 882, 884 (7th Cir. 2011) (recognizing the harm "to the public's perception of the judicial system when a judge who appears to be biased proceeds in a case") (citation and quotation

marks omitted).[3]  Special considerations come into play where a judge presiding over a case has been accused of partiality and is the only one to decide whether he may remain in the case.  *See, e.g., Green v. Murphy,* 259 F.2d 591, 595 (Hastie and Staley, JJ., concurring opinion) (3rd Cir. 1958) ("[a] trial is not likely to proceed in a very satisfactory way if an unsettled claim of judicial bias is an ever present source of tension and irritation.  Only a final ruling on the matter by a disinterested higher court before trial can dispel this unwholesome aura."), *cited with approval in In re Union Leader Corp*., 292 F.2d at 384.  Those considerations do not exist here.[4]

_____

[3] Notably, while this Court has decided that in an appropriate case, an issue of judicial disqualification may present a sufficiently extraordinary situation to justify mandamus review, it has not decided whether a district court's discretionary denial of a motion for a change of venue is an appropriate subject for mandamus review.  *See In re Kouri–Perez*, 134 F.3d 361 (1st Cir.1998) (unpublished *per curiam*).

[4] This Court has recognized "advisory mandamus," reserved for a tiny class of cases that present "novel questions of great significance which, if not immediately addressed, are likely to recur and to evade effective review."  *United States v. Green*, 407 F.3d 434, 439 (1st Cir. 2005).  Proof of irreparable harm is not required for advisory mandamus.  *Id.*  Tsarnaev has not claimed that advisory mandamus applies to his case, and it does not.

**II.**
**The District Court's Discretionary Procedures**
**for Selecting Impartial Jurors Are Well Within**
**Constitutional Limits And Are Working.**

Although we do not think that the Court should reach the merits of

Tsarnaev's claim because he has not made the showings required for mandamus

consideration, a review of the on-going jury selection process and its results

undermines Tsarnaev's claim that the district court necessarily will seat biased

jurors in this case. Tsarnaev cites selected statements in the questionnaires and

*voir dire* transcripts as proof that all five million members of the jury pool have

such "powerful emotional connections to the people, places, and events of the

Boston Marathon bombing" (or at least live in communities that do) that effective

*voir dire* is impossible. [Pet. at 2]. But as the district court found in denying

Tsarnaev's third motion for change of venue, Tsarnaev's "strategic selections of

quotes and specific experiences with a few jurors during *voir dire* are misleading

and not representative of the process as a whole." [Dkt. 1021, at 2]. The district

court explained that "the defendant's presentation of a series of selective

quotations from the 1300-plus questionnaires is misleading because the quotations

are not fairly representative of the content of the questionnaires generally. It is

possible to match the defendant's selection with a different group of quotations

that, considered by themselves, would lead to opposite conclusions." *Id*. at 6. The

court also noted that the questionnaire answers were "only a starting point" in

accurately understanding jurors' true views, and that face-to-face follow-up questioning by the court and the parties was generally needed to clarify those views. *Id*. at 4. For example, the court wrote, to understand whether any purported connection between a juror and the Marathon events "should disqualify a juror otherwise qualified to serve requires going beyond the face of the questionnaire and asking jurors directly about it." *Id.* at 5.

In our initial brief, we illustrated Tsarnaev's "strategic selections of quotes" from the questionnaires by analyzing the questionnaires of the first set of jurors to be questioned during *voir dire*. [Govt. Br. at 13-17]. We showed that of the first 20 jurors to be questioned, only 10 indicated on their questionnaires that they believe Tsarnaev is guilty, and of those ten, four indicated that they could set aside that view and judge the evidence impartially. *See id.* The remaining six were struck for cause. The relatively few jurors who believed that Tsarnaev was guilty and who could not set aside that opinion did not hesitate to say so, making it easy to filter them out. We also showed that of the first 30 jurors to be questioned, only a half dozen at most or 20% could fairly be characterized as having an actual, non-trivial connection to the Marathon events.

To further illustrate Tsarnaev's selective and misleading references to the questionnaires and juror *voir dire* in his petition, we have compiled the same information for all 54 jurors the court has actually qualified as eligible to sit on the

14

jury as of February 13, 2015.  Of those 54, 63% indicated that they have not

formed an opinion that Tsarnaev is guilty.  The remaining 37% indicated (either on

the questionnaire or during *voir dire*) that they could set aside their opinions and be

impartial.  Of the 54 qualified jurors, 96% (or all but two) said that they had not

formed an opinion that Tsarnaev should receive the death penalty.  The remaining

two indicated that they could set aside their opinions and keep an open mind about

the punishment.  Finally, of the 54 qualified jurors, 38 (or 70%) gave no positive

answer to Questions 81, 82, or 83, which probe whether the juror, a family member

or friend has even a trivial connection to the Marathon events.  Of the 16 who gave

positive answers, only five gave an answer that had to do with themselves

personally; the remainder gave answers indicating that someone else they knew

could respond positively.  All said that their positive answers would not affect their

ability to be impartial.

This case therefore is not analogous to *Irvin v. Dowd*, 366 U.S. 717 (1961),

in which eight of the 12 jurors actually seated on the jury had formed an opinion

that the defendant was guilty "and were familiar with the material facts and

circumstances involved, including the fact that other murders were attributed to

him, some going so far as to say that it would take evidence to overcome their

belief . . .  [and one saying] that he 'could not * * * give the defendant the benefit

of the doubt that he is innocent.'"  *Id.*  at 728.  It also is not analogous to *United*

15

*States v. McVeigh*, 918 F.Supp. 1467 (W.D. Okla. 1996), in which the parties

agreed that the case could not be tried in the district where the bombing occurred

(the main courthouse had been severely damaged) and the only question was where

to move it.  *Id*. at 1470.  In contrast, the facts of this case compare favorably to

those in *Patton v. Yount*, 467 U.S. 1025 (1984), where the Supreme Court held no

change of venue was mandated even though "*voir dire* showed that all but 2 of 163

veniremen questioned about the case had heard of it . . . that 126, or 77%, admitted

they would carry an opinion into the jury box . . . [and] 8 of the 14 jurors and

alternates actually seated admitted that at some time they had formed an opinion as

to Yount's guilt."  *Id*. at 1029-30.  Tsarnaev cites no case even remotely analogous

to this one in which a federal appellate court has held that a change of venue was

constitutionally mandated.  To hold on this record that the constitution mandates a

change of venue would be unprecedented.

Tsarnaev attempts to overcome the lack of case support by arguing that the

Marathon bombings were an attack on the entire community rather than just on

individuals, and that the facts of this case are therefore unique.  But numerous

other courts have rejected venue motions in cases involving extraordinarily high-

profile crimes with broad impact on the local population.  *See, e.g., United States

v. Skilling*, Case No. 04-25 (S.D. Tex.) (former CEO of Enron tried in Houston);

*Mikelonis et al. v. State Farm Fire and Cas. Co.*, Case No. 06-886 (S.D. Miss. Apr.

25, 2007) (insurer of homes destroyed by Hurricane Katrina tried on Mississippi coast); *United States v. Salameh*, No. S5-93-CR-0180 (S.D.N.Y. Sep. 15, 1993) (first World Trade Center bomber tried in lower Manhattan); *People v. Charles Manson*, Crim No. 21765 (Cal. Super. Ct. 1975) (notorious cult figure tried in Los Angeles); *New York v. David Berkowitz*, 93 Misc.2d 873, 879 (Sup. Ct. 1978) ("Son of Sam" serial killer tried in Brooklyn).  Tsarnaev's claim that the Marathon events have left an indelible impression on the minds of jurors -- even if true -- is beside the point; the Supreme Court in *Yount* declared that the persistence of "highly unfavorable publicity . . . [in] the memory of [the] community . . . is essentially irrelevant" to the presumed prejudice analysis.  *Id*. at 1035 (internal quotation marks and citation omitted).  "The relevant question [instead] is . . . whether the jurors . . .  [have] such fixed opinions that they could not judge impartially the guilt of the defendant."  *Id*. at 1035.

Finally, Tsarnaev has never addressed two important criticisms of his venue argument despite filing three lengthy initial briefs and two reply briefs in the court below and at least two lengthy briefs in this Court.  First, Tsarnaev has not, and cannot, refute the findings of his own public opinion survey that this case received nationwide publicity, and that roughly equal percentages of potential jurors consider him probably or definitely guilty in all four alternative venues he polled (Boston, Springfield, New York, and Washington, D.C.).  The nationwide

notoriety of this case necessarily diminishes its local notoriety as a factor in the venue calculus.  Second, Tsarnaev cannot seriously dispute the likelihood that even if this case is moved to another district, press attention will follow it, and additional requests for relief based on pretrial publicity are likely.  That, after all, is exactly what happened in *McVeigh*:  In February 1996, the case was moved from Tulsa to Denver, and in March 1997, McVeigh moved to dismiss the indictment or delay the trial for at least a year based on pretrial publicity occurring after the change of venue.  *See United States v. McVeigh*, 153 F.3d 1166, 1177, 1180 (10th Cir. 1998).  The delay that will inevitably be caused by a change of venue will simply allow time for additional waves of publicity to gather form.

In sum, Tsarnaev has not demonstrated error in the district court's finding that "the *voir dire* process is successfully identifying potential jurors who are capable of serving as fair and impartial jurors in this case," and that examination of the questionnaires and *voir dire* transcripts make the argument for a constitutionally-mandated change of venue less, rather than more, compelling. [Dkt. 1021, at 2-3].

## Conclusion

For the reasons set forth here, in the government's January 1, 2015 opposition to the defendant's first petition for a writ of mandamus (filed in Appeal No. 14-2362), and in its February 6, 2015 opposition to the defendant's second

petition for a writ of mandamus (filed in this case), the government respectfully

requests that the Court deny the defendant's second petition for a writ of

mandamus.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:    /s/ *William D. Weinreb*
WILLIAM D. WEINREB
Assistant U.S. Attorney


## Certificate of Service

I, William B. Weinreb, AUSA, hereby certify that on February 17, 2015, I caused a copy of this motion to be served by first-class mail on the following defense counsel:

Judith H. Mizner, Esq.
William W. Fick, Esq.
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210

In addition, I certify that on February 5, 2015, I caused a copy of this motion to be served in hand on the district court, the Honorable George A. O'Toole.

/s/ *William D. Weinreb*
WILLIAM D. WEINREB
Assistant U.S. Attorney