UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
_____

No. 15-1170
_____

In re
DZHOKHAR TSARNAEV,
Petitioner
_____

REDACTED FOR PUBLIC DOCKET

**SUPPLEMENTAL BRIEF IN SUPPORT OF SECOND PETITION FOR
<u>WRIT OF MANDAMUS</u>**

Pursuant to this Court's Order of February 12, 2015, Dzhokhar Tsarnaev, by and through counsel, respectfully submits this supplemental brief in support of his renewed request that this Court issue a writ of mandamus ordering the district court to grant a change of venue.

> The great value of the trial by jury certainly consists in its fairness and impartiality. Those who most prize the institution, prize it because it furnishes a tribunal which may be expected to be uninfluenced by an undue bias of the mind. I have always conceived, and still conceive, an impartial jury as required by the common law, and as secured by the constitution, must be composed of men who will fairly hear the testimony which may be offered to them, and bring in their verdict according to that testimony, and according to the law arising on it. This is not to be expected, certainly the law does not expect it, where the jurors, before they hear the testimony, have deliberately formed and delivered an opinion that the person whom they are to try is guilty or innocent of the charge alleged against him.

*United States v. Burr*, 25 F. Cas. 49, 50 (1807) (Marshall, C.J.).

The constitutional mandate of a fair trial by an impartial jury requires a change of venue where an impartial jury cannot be empaneled in the district where the indictment is returned. *See, e.g., Groppi v. Wisconsin*, 400 U.S. 505, 510-511 (1971) (only change of venue may be constitutionally sufficient in some circumstances to assure impartial jury). Given the impacts of the events at issue in this case on potential jurors and the communities in which they live, coupled with ubiquitous daily and often emotional reminders of those events, it is not reasonable to expect jurors from this division to set aside those influences and to provide the fair and impartial jury the Constitution requires. Indeed, examination of the 1,373 completed juror questionnaires confirms petitioner's analysis of pre-trial publicity and an opinion poll conducted prior to the commencement of the ongoing jury empanelment. As discussed in petitioner's first Petition for Writ of Mandamus (case no. 14-2362), this Second Petition, and in his motions for change of venue in the district court [D.E. 376, 461, 686, 696, 774, 779, 780, 852, 980, 981, 996], the totality of the facts and circumstances surrounding this prosecution establishes a presumption of prejudice arising from a confluence of sources. The widespread victimization created by the Marathon bombings and their aftermath, coupled with the unrelenting publicity, both factual and emotional, from the time of the events to the present has produced a situation unparalleled in the District of Massachusetts. It is one of the rare instances in which prejudice can, and must, be presumed. As

2

this Court stated in *United States v. Rodriguez-Cardona*, 924 F.2d 1148 (1st Cir.

1991):

> Prejudice may properly be presumed when either (a) inflammatory
> publicity about a case has so saturated a community that it is almost
> impossible to draw an impartial jury from that community, or (b) so
> many jurors admit to a disqualifying prejudice that the trial court may
> legitimately doubt the avowals of impartiality made by the remaining
> jurors

*Id. at 1158; see also United States v. Brien*, 617 F.2d 299, 313 (1st Cir. 1980)

(recognizing publicity can give rise to presumption of prejudice and noting, in

course of upholding denial of motion to dismiss for prejudicial pre-indictment

publicity, that venue had been changed from Boston to Springfield, Massachusetts

for some defendants and to Arizona for another defendant); *United States v.

Angiulo*, 897 F.2d 1169, 181-1182 (1st Cir 1990) (discussing criteria for

presumption of prejudice).

## I.    THE RESPONSES IN THE JUROR QUESTIONNAIRES DISTINGUISH THIS CASE FROM OTHERS IN WHICH NO PRESUMPTION OF PREJUDICE HAS BEEN FOUND.

In evaluating whether prejudice may be presumed, it is the effect on the

venire that must be examined.  Petitioner has set out aggregate data from the

completed juror questionnaires.  *See* Second Petition at 9-11.  That data shows

opinions of guilt among, and personal connections of, jurors far beyond those in

*United States v. Skilling*, 561 U.S. 358 (2010) (*see* Second Petition at 32) or cases

in which this Court has held that the presumptive prejudice required for a change of venue or a continuance was not established.

Here, nine hundred and thirty five (935), or sixty-eight percent (68%), of potential jurors completing questionnaires responded that they had formed an opinion that Mr. Tsarnaev "is" guilty.  Three hundred and forty-five (345) potential jurors, or twenty-five percent (25%), were unsure. But only sixty-six (66), or five percent (5%), responded that they had formed an opinion that he isnot guilty. Potential jurors were also asked whether they could set aside opinions they had reached and base their decision about guilt and punishment solely on evidence presented in court.  Five hundred and forty five (545) or forty percent (40%) said they could not; just four hundred and eighty three (483) or thirty-five percent (35%) said they were able to do so, and authority discussed *infra* mandates that such confidence must not be taken at face value.

In *United States v. Moreno Morales*, 815 F.2d 725 (1st Cir. 1987), a case involving "a publicity issue of  unusual seriousness, presenting . . . charges of cold-blooded murder [by police officers] and police corruption that became *causes celebres* throughout Puerto Rico," the district court denied a second continuance.[1] *Id*. at 734.  Upholding that denial, this Court discussed community sentiment and

---

[1] Defendants in that case did not seek a change of venue.

found an insufficient basis for a presumption of prejudice where statistics based on "the often subjective task of categorizing voir dire testimony" showed that approximately 25% of the venire members "admitted, in varying degrees, to believing that defendants were guilty.  Roughly ten percent of the venire suggested some belief that appellants may be innocent."  Although "inherently imprecise," these statistics "provide[d] a useful estimate of venire attitudes."  *Id*. at 735.  In *Angiulo*, this Court noted that defendant did "not point to any indicia of prejudice as strong as those that were rejected by us in *Moreno Morales*.  At most, they claim that jurors in the venire were familiar with the Angiulo name, and some associated it with the Mafia."  897 F.2d at 1182.  In *Rodriguez-Cardona*, upholding the denial of a motion for change of venue, this Court found no presumption of prejudice warranted where defendant failed to make a record of the publicity in the district court and "during voir dire, the court identified no more than 15 (and perhaps as few as 12) potential jurors who had been exposed to *any* information whatsoever about the case."  924 F.2d at 1158.

None of the prior cases in this Circuit involved the overwhelming belief in guilt combined with the types of personal connections to the events at issue in this case that potential jurors have expressed here, or addressed the impact of such connections on whether a fair and impartial jury can be empaneled in this district. As petitioner has stated previously, it is those connections and the way in which

the events have affected the population of this division that, together with the prejudicial pretrial publicity, require extraordinary relief.

Both the government and the district court have repeatedly dismissed *United States v. McVeigh*, 918 F.Supp. 1467 (W.D.Okla. 1966), as not pertinent, with the government emphasizing the agreement of the parties that the case could not be tried in the district where the bombing occurred.  *See, e.g.,* Opposition to Second Petition for Mandamus ("Opp.") at 5.  Yet *McVeigh*, in which venue was changed to Denver, Colorado (rather than another location in Oklahoma as the government had proposed), is the case most closely analogous to this case.  It was a bombing case with initial comprehensive nationwide publicity.  However, the publicity in Oklahoma continued to be comprehensive and extensive, with intensive coverage of the victims and their stories as national attention faded.  So too here.  The court discussed the "Oklahoma family" uniting to respond to the tragedy and survival and recovery as "Oklahoma's story."   Here, "Boston Strong" remains a unifying theme.  Just as the bombing's affect on Oklahomans led Judge Matsch to find a presumption of prejudice that required a change of venue to another state, so too here, that relief is required.

Additional responses to questions addressing personal connections further illustrate the impact of the events at issue in this case upon the potential jurors:

- ████████













## II.    PREJUDICIAL PRETRIAL PUBLICITY REQUIRES A CHANGE OF VENUE.

The government seeks to minimize the nature and impact of pretrial publicity, characterizing it as not "unduly inflammatory or prejudicial," and stating that the Boston Globe and Boston Herald are delivered regularly to less than 7% of the district's population, and noting that two years have passed since Mr. Tsarnaev's arrest.  Opp. at 4.  The Court should reject the government's arguments.

While relatively few potential jurors may receive home delivery of the *Globe* or *Herald*, the papers are available on line and they are cited simply as examples of exhaustive media attention, which also includes coverage by television and other electronic media, including social media.   All but four of the 1,373 potential jurors completing questionnaires said they had been exposed to publicity.  Moreover, it was impossible to attend civic gatherings over the last two years, from sporting events to concerts, without encountering repeated reminders of the events of April 2013.

Petitioner has documented the publicity in his prior filings in this Court and the district court (incorporated by reference in his prior filings) and will not repeat the description of pretrial publicity here.   However, the Court also can take judicial notice of the physical environs surrounding the Moakley Courthouse as a further illustration of the ongoing and pervasive public reminders of the Marathon bombings and their aftermath.  Attached hereto as Exhibit A are photographs taken

13

on February 12, 2015, of a cement truck in the construction site in front of the Courthouse emblazoned with the slogans, "Boston Strong"; "This is Our * * * * * * * City"; and "Thank You First Responders." An additional photograph in Exhibit A, taken earlier in 2014, shows a "Boston Strong" banner that literally overshadowed the Courthouse at that time.

The government simply ignores the continuing flow of the publicity and its emotional impact. Almost two years may have passed since the stories of Mr. Tsarnaev's arrest but stories about the bombing victims, survivors, and the community attachment to the Marathon continue through the present. *See* Second Petition at 29-32. The government also ignores the research addressing the effects of pretrial publicity and the way in which potential jurors exposed to pretrial publicity form a "story model" through which the evidence presented at trial is viewed. *See* First Petition at 22-25 and district court materials incorporated by reference.

While there may have been no reports of criminal history, an offer to plead guilty, a confession to other crimes, or last-minute admissions, Opp. at 4, the government ignores the reports of admissions and confessions that will not be admitted in the government's case in chief, the reports linking the Marathon bombings to terrorist activities and groups elsewhere, the reports concerning defendant's alleged marijuana use and sales, and the reports describing the

14

convictions and guilty pleas of Mr. Tsarnaev's friends charged with obstructing justice and lying to investigators in connection with this case, all of which are prejudicial and enhance the story of guilt contained in the media coverage.

The totality of the personal connections between potential jurors and the events at issue in this case, coupled with the extensive, ongoing publicity, a significant portion of which is and has powerfully emotional content, focusing on survivors and their struggles and suggesting links between the Marathon bombings and acts of terrorism elsewhere, takes this case out of the realm of the ordinary and has created a presumption of prejudice mandating a change of venue.

### III. VOIR DIRE IS INADEQUATE TO ADDRESS THE PRESUMPTION OF PREJUDICE.

As courts, including this Court, have warned, evaluating juror bias is not an easy task and assertions of ability to set opinions aside and to be "fair and impartial" cannot simply be accepted at face value. The difficulty of ascertaining bias in potential jurors has been long recognized. As the Supreme Court stated in 1908:

> Bias or prejudice is such an elusive condition of mind that it is most difficult, if not impossible, to always recognize its existence, and it might exist in the mind of one (on account of his relation with one of the parties) who was quite positive that he had no bias, and said that he was perfectly able to decide the question wholly uninfluenced by anything but the evidence.

*Crawford v. United States*, 212 U.S. 183, 196 (1908) (holding that druggist whose

store was a subpostal station and who was paid annual compensation by the

government for acting as a clerk of the city post office was a salaried employee of

the government and could not sit as juror in case charging conspiracy to defraud

United States in relation to contract between company supplying mailbags and

United States Post Office Department ); s*ee also Irwin v. Dowd*, 366 U.S. 717, 728

(1961) ("The influence that lurks in an opinion once formed is so persistent that it

unconsciously fights detachment from the mental processes of the average man"

and,  "psychological impact requiring such a declaration [of ability to be fair and

impartial] before one's fellows is often its father.  Where so many, so many times,

admitted prejudice, such a statement of impartiality can be given little weight.").

In *Delaney v. United States*, 199 F.2d 107 (1st Cir. 1952) this Court recognized the

difficulty of assuming that the average juror "may confidently exclude even the

unconscious influence of his preconceptions as to probable guilt, engendered by a

pervasive pre-trial publicity."  *Id*. at 112-113.

　　　Claims of impartiality should be rejected where prejudice is widespread.  In

*Angiulo*, this Court stated that "[w]hen a high percentage of the venire admits to a

disqualifying prejudice, a court may properly question the remaining jurors'

avowals of impartiality, and choose to presume prejudice."   897 F.2d  at 1181; *see*

*also Moreno Morales*, 815 F.2d at 734 (quoting *Murphy v. Florida*, 421 U.S. 794,

803 (1975)) ("[i]n a community where most veniremen will admit to a

disqualifying prejudice, the reliability of the others' protestations may be drawn into question; for it is then more probable that they are part of a community deeply hostile to the accused, and more likely that they may unwittingly have been influenced by it."); *United States v. Marcello*, 280 F.Supp. 510, 514 (E.D.La. 1968), *aff'd* 423 F.2d 993 (5th Cir. 1970) (quoting this Court's decision in *Delaney v. United States*, 199 F.2d 107, 112-113 (1st Cir. 1952)).

Social science research confirming the inadequacy of voir dire as a remedy in a case such as this has been set out in both this Petition and the initial Petition, and district court materials incorporated by reference. We add here additional studies showing the limitations of voir dire in ferreting out juror bias. *See, e.g.,* Shari Seidman Diamond et al., "Realistic Responses to the Limitations of Batson v. Kentucky," 7 CORNELL J .L. & PUB. POL'Y 77, 88-93 (1997); Norbert L. Kerr et al., "On the Effectiveness of Voir Dire in Criminal Cases With Prejudicial Pretrial Publicity: An Empirical Study," 40 AM. U. L. REV 665 (1991).

The district court itself crystallized the problem of unexpressed, perhaps latent, bias ███████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████  █

████████████████████████████████████████████████

██████████████████████████████████, the District Court has

provided another illustration of the need for change of venue.  Every juror will

return home every night to communities deeply affected by the events underlying

this case.

### IV.    THE VOIR DIRE IN THIS CASE HAS BEEN DEFICIENT.

In opposing this Petition the government maintains that "a rigorous and

searching voir dire" conducted by the district court, Opp. at 1, is sufficient to

assure a fair and impartial jury.[2]  Petitioner submits that he has demonstrated,

through examination of the pretrial publicity, opinion survey, and the juror

questionnaires that this is one of the rare cases in which a change of venue is

required by the presumption of prejudice.  Such a presumption cannot be overcome

as a matter of law, voir dire in a venire so rife with prejudice is inherently

unreliable, and thus there is no basis to examine the actual voir dire.  However, if

this Court does engage in such a review, the record here confirms that voir dire is

not an effective remedy to ensure selection of an impartial jury.

---

[2] ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████

While voir dire has been lengthy, it has not been consistently rigorous and searching in assessing the content of the pretrial publicity to which a juror has been exposed and the nature of the jurors' personal connections to the Marathon events.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████    Notably, f the ██ jurors who have been qualified
or where qualification is pending, ████████ admitted in their questionnaires
connections to the people, places, and/or events of the Boston Marathon Bombing
and its aftermath.

Transcripts of every day of voir dire are on file in the district court and thus
available to this Court.  The transcripts are replete with jurors who maintain, in
response to leading questions, that they aspire to be fair and impartial.  But the
record as a whole provides scant basis for confidence that they will be able to do
so.

## V.    PROCEEDING WITH TRIAL IN BOSTON WILL CAUSE IRREPARABLE HARM.

Petitioner has argued, with reference to selected examples, that commentary
about the ongoing voir dire process illustrates damage to the appearance of
impartiality and public confidence in the proceedings caused by proceeding with
trial in Boston.  He adds the following examples:

The venue rulings so far in the Tsarnaev case . . . tell the defendant, his prospective jurors, and the world that the law is content to take it on faith that Massachusetts' residents, including those who live and work at or near the blast site, will be able to be of two minds when they swear an oath to give Tsarnaev his constitutional presumption of innocence. That they will unlearn what they have learned about him, forget what they have seen about his brother, and clear out of their heads the sounds they have strained to hear, week after week after week, since April 2013.

All of this is unconstitutional, absurd, and contrary to human nature . . . .

The law always has presumed that a community that suffers a grievous loss has the right to seek justice for that loss. And in most cases there is no reason to move even those criminal trials that generate intense local interest. But the Boston Marathon bombing was no ordinary crime and the Tsarnaev trial is no ordinary capital case. Tsarnaev has at least as much of a right to a venue change as did McVeigh and Nichols. And if he does not get that venue change the result of his trial — surely a conviction and perhaps a death sentence — will be forever tainted by the stubborn refusal of the courts to guarantee him the fairest possible trial the Constitution requires.

Andrew Cohen, *Can Tsarnaev Get a Fair Trial in Boston? Of Course Not*,

BRENNAN CENTER FOR JUSTICE (Jan. 9, 2015*), available at*

<http://www.brennancenter.org/analysis/can-tsarnaev-get-fair-trial-boston-course-

not>;  *see also, e.g.,* Thomas Farragher,  *Tsarnaev Trial Should Be Moved to*

*Another Venue*, THE BOSTON GLOBE (Feb. 7, 2015), *available at*

<http://www.bostonglobe.com/metro/2015/02/06/tsarnaev-trial-should-moved-

another-venue/5HovPmXy1dTyv1XhV5VzSI/story.html>; Emily Rooney, *The*

*Case For Moving The Trial Of Boston Marathon Bombing Suspect Dzhokhar*

*Tsarnaev*, WGBH (Feb. 6, 2015), *available at* <http://wgbhnews.org/post/case-

moving-trial-boston-marathon-bombing-suspect-dzhokhar-tsarnaev>.

## <u>Conclusion</u>

For the foregoing reasons, this Court should grant the writ and order a

change of venue.

Respectfully submitted,

DZHOKHAR TSARNAEV
by his attorneys,

/s/ Judith Mizner
Judith Mizner (1st Cir. No. 11056 )
William W. Fick (1st Cir. No. 82686)
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
Boston, MA 02210
(617) 223-8061
JUDITH_MIZNER@FD.ORG

WILLIAM_FICK@FD.ORG

## <u>CERTIFICATE OF SERVICE</u>

    I, William Fick, hereby certify that this document filed through the ECF system will be sent to the registered participants, including counsel of record William Weinreb, Aloke Chakravarty, Nadine Pellegrini, Steve Mellin, and Dina Chaitowitz, as identified on the Notice of Electronic Filing on February 17, 2015.

                                     /s/ William W. Fick

Second Petition for Writ of Mandamus
In re Tsarnaev, No. 15-1170
Exhibit A page 1



Second Petition for Writ of Mandamus
In re Tsarnaev, No. 15-1170
Exhibit A page 2



Second Petition for Writ of Mandamus
In re Tsarnaev, No. 15-1170
Exhibit A page 3

